2021 IL App (2d) 180925-U
No. 2-18-0925
Order filed May 5, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16-CF-1310 |
| ALFREDO SOTO, | ) ) | Honorable T.Clint Hull, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE ZENOFF delivered the judgment of the court.
Presiding Justice Bridges and Justice Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defense counsel's performance did not amount to ineffective assistance where counsel's alleged deficiencies were trial strategy. Even if counsel's conduct was objectively unreasonable, the defendant was not prejudiced, because the evidence of guilt was overwhelming. Specifically, the Appellate Court held that defense counsel was not ineffective in tendering two issues instructions, where both instructed the jury that the State had the burden to prove that the defendant was not justified in using the force that he used.

¶ 2        Following a jury trial, defendant, Alfredo Soto, was convicted of first-degree murder (720

ILCS 5/9-1(a)(1) (West 2016)). The jury also found that the State proved that defendant personally

discharged a firearm that proximately caused the victim's death. The court sentenced defendant to

60 years' imprisonment in the Illinois Department of Corrections. Defendant timely appealed. We

affirm.

¶ 3                                    I. BACKGROUND

¶ 4        Defendant's conviction arose from the August 1, 2016, fatal shooting of Martiniano

Alvarez at the Latin American Club (Club), a private social club, in Aurora, Illinois. The shooting

was captured by the Club's security cameras, and the pertinent footage was entered into evidence

in the State's case-in-chief at trial.

¶ 5                              A. The State's Case-In-Chief

¶ 6                                  1. *The Security Video*

¶ 7        The security video showed the following. In the early evening of August 1, 2016,

defendant, Domingo Anya, and Miguel Rodriguez were among those present at the Club. The three

men were drinking at the bar. Defendant wore a cowboy hat, dark pants, and a blue plaid shirt. At

approximately 6:02 p.m., the victim entered the bar. He nodded at Anya and took a seat at the

corner of the bar. Throughout the video, the bartender, Laura Gonzalez, was in close proximity to

the four men.

¶ 8        The men sat at the bar, drinking, until approximately 6:06 p.m., when defendant left the

Club. Outside in the parking lot, defendant got into the cab of his pick-up truck. Less than one

minute later, defendant re-entered the Club. Shortly thereafter, the victim shook hands with

Rodriguez, Anya, and defendant. Defendant and the victim fist-bumped one another. Defendant

gave the victim a thumbs-up. The victim nodded at defendant.

¶ 9     At approximately 6:39 p.m., defendant walked slowly toward the exit door, while looking over his shoulder toward the bar. The victim took a swig of his beer. He then ambled, his arms swinging at his sides, to where defendant seemed to be waiting by the exit. Defendant fired four shots, and the victim fell to the floor.

¶ 10    Defendant looked at the victim. Then, clutching his gun, defendant slowly walked to his pick-up truck and drove away. Rodriguez and Anya fled the scene.

¶ 11                          2. *The Police Investigation*

¶ 12    Brian Hammond, the first police officer at the scene, did not see a gun beneath the victim, nor did he see anything fall off the victim when his body was placed on a stretcher. At the scene, the police recovered three fired bullets and four cartridge cases. Other police officers located defendant's pick-up truck, which was parked in the driveway of the house where defendant rented a room. According to defendant's sister-in-law, Kathy Sheldon, defendant came home a little past 6:30 p.m. on August 1, 2016, acting frantic and hurried. Defendant told Sheldon that he shot someone and hid the gun in the basement of Sheldon's house, where no one would find it. At defendant's request, Sheldon called 911. Defendant surrendered to the police.

¶ 13    That evening, while executing a search warrant at Sheldon's house, the police found the dark pants that defendant had worn while at the Club. In a bathroom, the police discovered defendant's plaid shirt soaking in a bucket of liquid that smelled like bleach. A bottle of bleach was nearby. The police also recovered a .380 semi-automatic firearm from underneath a cardboard box in the basement. Later testing showed the firearm to be the weapon that killed the victim. Testing also revealed that the steering wheel of defendant's truck did not contain gunshot residue. The police swabbed defendant's hands for gunshot residue, but the results were inconclusive.

Forensic analysis showed that the bullets and casings recovered from the scene were fired from the gun recovered from Sheldon's basement.

¶ 14    Forensic pathologist, Dr. Mitra Kalelkar, performed an autopsy. According to Dr. Kalelkar, the victim died of cranial cerebral injuries due to a gunshot wound to the head. Dr. Kalelkar noted that the stippling and soot surrounding the gunshot wound indicated that the victim was shot at close range, from a distance of up to two feet.

¶ 15                                  3. *Marisol Alvarez*

¶ 16    Marisol Alvarez testified without objection to the following. She was married to the victim for six years and had known him for eight years. The victim never owned a gun, nor had Marisol ever seen him with a gun. The victim did not use any illegal drugs, did not have any tattoos, and was never arrested for anything other than a traffic offense. Following the victim's death, Marisol granted the police officers permission to search the victim's truck, cellphone, and apartment. To her knowledge, the police did not recover anything as a result of these searches. Marisol testified that the victim was from Michoacán, Mexico, where his body was laid to rest.

¶ 17                                  4. *Laura Gonzalez*

¶ 18    Gonzalez testified that she was working as a bartender at the Club on the evening of August 1, 2016. Defendant, Rodriguez, and Anya, who were regular customers, were there that evening. The victim, who was not a regular customer, was also present. Gonzalez testified that the victim bought a round of drinks for everyone, including defendant. Ten to fifteen minutes later, defendant bought everyone, including the victim, a round. Gonzalez offered defendant a beer, but he refused and asked for tequila instead. She told him that this would be his last tequila. She noticed that defendant was acting "differently." Gonzalez was trained to call her boss, Jesse, if she saw any

arguing or fighting in the bar. She did not hear any threats or raised voices that day. Nor did she hear anyone say, "I am going to kill you." If she had, she would have called Jesse.

¶ 19    Gonzalez testified that she was sitting behind the bar, in front of the four men, when she overheard their conversation. According to Gonzalez, the men were discussing their occupations and where they were from in Mexico. Then, Gonzalez testified, around 6:30 p.m., defendant walked toward the exit and the victim followed him. Gonzalez testified that she did not hear defendant say anything to the victim.[1] She heard the first gunshot and thought that someone had slammed a door. Gonzalez looked up and saw defendant's arm raised toward the victim. She heard three more gunshots. While Gonzalez called 911, Anya and Rodriguez ran toward the patio, which was closed off. Anya and Rodriguez ran back and Anya said "Soto, *que hiciste*," which Gonzalez translated as, "Soto, what did you do?" Gonzalez did not see the victim with a gun that night.

¶ 20                                    5. *The Bar Patrons*

¶ 21    Anya testified that, on August 1, 2016, he went to the Club around 5 or 5:30 p.m. Anya testified that the victim "came in, and he sat down in the corner." According to Anya, the victim "asked us for permission to be there with us, and we told him yeah." The victim offered to buy them some beers and they accepted. Anya had never seen the victim before. According to Anya, the victim shook everybody's hands. Anya never heard the victim make any threats toward defendant. Nor did Anya hear defendant make any threats toward the victim. Anya explained,

---

[1] On the recorded 911 call, Gonzalez told the operator that, "[defendant] called [the victim] to the door and he shot him." Also, in a recorded conversation between Officer Katelyn Groom and Gonzalez, Gonzalez told Groom that defendant said to the victim, "[h]ey, you, come to the door."

"[W]e were all perfectly fine [until] the incident happened." Anya testified that, at one point, defendant said that he had to talk to the victim.[2] Then, defendant walked to the door, and the victim followed him. Anya heard two or three shots and saw the victim fall. Anya explained that he and Rodriguez tried to flee through the patio but could not jump the fence, so they ran toward the exit. Anya ran to his car and left the Club.

¶ 22    Rodriguez testified that the victim, whom Rodriguez had seen once before, said that he was from Michoacán, Mexico. Rodriguez testified that there were no arguments or threats among the men at the bar. According to Rodriguez, the victim did not have a gun. Rodriguez testified that the victim did not speak with defendant. While Rodriguez was watching the television at the bar, he became aware that the victim left the bar. Next, Rodriguez heard three to four gunshots.

¶ 23                                    B. Defendant's Case-in-Chief

¶ 24                                    1. *Defendant's Testimony*

¶ 25    Following the denial of his motion for a directed verdict, defendant testified in his own behalf. Defendant was 51 years old. He was originally from Guanajuato, Mexico, but he had lived in Aurora since approximately 1992. He had been a member of the Club for more than ten years. Defendant explained that he pleaded guilty to criminal damage to property in 2014 and served a jail sentence. Defendant testified that he quit heavy cocaine use in December of 2015. According to defendant, after he quit using cocaine, unknown people approached him at the Club numerous times wanting him to sell cocaine for them. Defendant testified that he turned those people down.

---

[2] On cross-examination, Anya testified that he heard the defendant say, "hey, let's just talk," and the victim responded, "yeah, that's fine, let's talk, yeah."

¶ 26     According to defendant, on February 26, 2016, he was attacked and beaten in the Club's parking lot by two men whom he did not recognize. One of the men told him, in accented English, that next time he would be "gone for good." Defendant said that he did not report this incident to the authorities, but the next day he asked to review the Club's surveillance video to try to identify the attackers. According to defendant, he did not view the video, but he bought a gun for protection.

¶ 27     Defendant testified that, on August 1, 2016, he arrived at the Club around 2 p.m. to play pool and socialize. He had his gun in his waist. The victim, whom defendant had never seen before, sat at the corner of the bar. He told defendant that he had a message for defendant from La Familia Michoacana, which is a Mexican drug cartel. The message was that he was there to kill defendant. According to defendant, he later heard the victim say that he was from Michoacán and that, one time, "he got somebody with a rope" and dragged him behind his horse.

¶ 28     Defendant further testified that he did not immediately leave the Club, because he thought that somebody else would be outside waiting to harm him. To avoid a confrontation, defendant eventually decided to leave, and headed for the door. Defendant explained that the victim said, "stop, because I am going to kill you." When the victim was about three feet away, the victim reached toward his waist and defendant shot him. Defendant said that he thought that the victim was going to kill him, even though defendant did not see a gun.

¶ 29     After he arrived home, defendant put his gun in Sheldon's basement because there were other people in the house. He asked Sheldon to call 911, and the operator directed defendant to remove his clothes.[3] Defendant denied trying to hide his clothes. He also denied that he put his shirt in a bucket of bleach.

_____

    [3] This 911 call was not in evidence at trial.

¶ 30                                    2. *Jesse Renteria*

¶ 31    Jesse Renteria, the Club's secretary, testified that he saw blood in the Club's parking lot in February 2016. Renteria explained that defendant had asked to see the surveillance video from the night that defendant was allegedly attacked, but the video had been erased.

¶ 32                                    3. *Sylvia Alvarez*

¶ 33    Sylvia Alvarez testified that, as of August 2016, she had worked at the Club as a manager and bartender for two years. Sylvia knew the victim. Defendant told Sylvia that he had problems with the victim. Specifically, on three different occasions, Sylvia witnessed the victim threaten to kill defendant. Upon hearing the third threat, Sylvia kicked the victim out of the Club. During these three separate incidents, Sylvia did not see the victim with a gun.

¶ 34                                    4. *Dr. Jesse De La Cruz*

¶ 35    Dr. Jesse De La Cruz testified as an expert in Mexican drug cartels. He explained that La Familia Michoacana is in the business of drug distribution and has a reputation for being a violent cartel. He explained that he can discern whether someone is in a cartel just by looking at him. Dr. De La Cruz testified that members of the cartel are usually well dressed, with a cowboy hat, cowboy boots, a belt with a thick buckle, and nice jeans. He explained how cartels come into a community, target an individual, and ask that person to sell drugs. If that person refuses the request, that individual would be threatened with violence. However, Dr. De La Cruz explained, members of cartels generally do not show off to other people that they are members of the cartel. After Dr. De La Cruz finished his testimony, the defense rested.

¶ 36                                    C. The State's Rebuttal

¶ 37    We summarize the salient portions of the testimony provided by key witnesses whom the State called in rebuttal.

¶ 38                                    1. *Alex Martel*

¶ 39    Alex Martel testified that he was the Club's treasurer in 2016. He had seen the victim in the Club two or three times before he authorized the victim's membership.

¶ 40                               2. *Detective Joshua Mendez*

¶ 41    Detective Joshua Mendez testified that, when he interviewed Sylvia Alvarez on August 1, 2016, she did not state that the victim had threatened defendant.

¶ 42                                3. *Detective Jason Cudebec*

¶ 43    Detective Jason Cudebec testified that he interviewed Sylvia Alvarez in 2018. Sylvia said that she had witnessed the victim threaten defendant three different times. The first threat occurred over one year before the shooting, the second took place approximately six months before the shooting, and the third threat occurred four or five months before the shooting.

¶ 44                              4. *Special Agent Tino Gonzalez*

¶ 45    Special agent for Homeland Security, Tino Gonzalez, testified that La Familia Michoacana is known for being an especially violent cartel. Even though Gonzalez had not heard anything about La Familia Michoacana in recent years, he believed that it was operating in Chicago. He also explained that cartels are more likely to trust someone from Mexico. However, according to Gonzalez, cartels never seek out people whom they do not know and solicit those people to sell drugs. Further, according to Gonzalez, the cartel actively tries to maintain a low profile in the United States.

¶ 46                                    D. Jury Instructions

¶ 47    Following the close of evidence, the court and the parties held the jury instructions conference. At defendant's request, the court gave two issues instructions: a modified Illinois Pattern Jury Instruction Criminal, No. 7.02 and Illinois Pattern Jury Instruction, Criminal No. 7.06

(approved January 30, 2015) (hereinafter IPI Criminal No. 7.02 and 7.06, respectively.) According to the Committee Notes, IPI Criminal No. 7.02 is to be used in first-degree murder cases when second-degree murder is not also an issue. IPI Criminal No. 7.06 is to be used when the jury is instructed on both first-degree and second-degree murder. Both instructions informed the jury that the State had the burden to prove that defendant was not justified in using the force that he used.

¶ 48                                        E. Note from the Jury

¶ 49     The jury retired to deliberate at 12:14 p.m. At 5:08 p.m., it sent a note requesting to read the transcript of defendant's testimony. Over the defense's objection, the court responded to the jury that the transcript would be provided but that it could take up to two hours to prepare. The court instructed the jury to continue deliberating in the meantime. The jury returned its verdict at 5:52 p.m., finding defendant guilty of first-degree murder, and further finding that defendant personally discharged a firearm that proximately caused the death of another person.

¶ 50     Following the denial of the defense's postjudgment motions, defendant timely appealed.

¶ 51                                        II. ANALYSIS

¶ 52     Defendant argues that defense counsel was ineffective in (1) calling Sylvia Alvarez as a witness because her testimony that the victim threatened defendant on three prior occasions contradicted defendant's own testimony that he had never before seen the victim, (2) failing to object to "improper character evidence" when the victim's wife testified that the victim did not own a gun, did not have tattoos, did not use drugs, and had never been arrested for anything other than a traffic offense, (3) creating jury confusion by tendering a first-degree murder jury instruction when both first-degree murder and second-degree murder were at issue, and (4) failing to ask the court to suspend jury deliberations while the transcript of defendant's testimony was being

prepared. Defendant contends that these errors, individually and cumulatively, deprived him of a fair trial. Defendant urges this court to reverse his conviction and to remand for a new trial.

¶ 53    Under the two-prong test of *Strickland v. Washington*, 466 U.S. 668 (1984), to succeed on a claim of ineffective assistance of counsel, a defendant must show that (1) his counsel's performance was deficient and (2) the deficient performance prejudiced the defendant. *Strickland*, 466 U.S. at 687. A defendant must satisfy both prongs of the *Strickland* test, and failure to satisfy either prong precludes a finding of ineffective assistance. *People v. Milton*, 354 Ill. App. 3d 283, 289 (2004). The ultimate question of whether counsel's actions support a claim of ineffective assistance is a question of law that is subject to *de novo* review on appeal. *People v. Peterson*, 2015 IL App (3d) 130157, ¶ 222.

¶ 54    We first examine the jury instructions issue and consider whether defense counsel rendered ineffective assistance. Defendant argues that it was objectively unreasonable for counsel to tender both IPI Criminal No. 7.02 and 7.06 because (1) the Committee Notes provide that only IPI Criminal No. 7.06, the combined issues instruction, be given, (2) the tendering of dual instructions would have confused the jury, and (3) IPI Criminal No. 7.02 incorrectly directed the jury to find defendant guilty of first-degree murder if all the elements were proved, without giving the jury the option of considering whether defendant had proved by a preponderance of the evidence that a mitigating factor was present. Defendant asserts that, not only was defense counsel's tendering of IPI Criminal No. 7.02 and 7.06 objectively unreasonable, but it was also prejudicial.

¶ 55    The State responds that (1) while defense counsel could have been clearer that only IPI Criminal No. 7.06 was to be given, the instructions were not so contradictory or inconsistent as to mislead the jury into not considering the mitigating factor, and (2) because the evidence of defendant's guilt was overwhelming, he was not prejudiced.

¶ 56    The purpose of jury instructions is to provide the jurors with the correct legal principles that apply to the evidence, so that they can reach a correct verdict. *People v. Lovejoy*, 235 Ill. 2d 97, 150 (2009). When examining instructions in a case, no single instruction is to be viewed in isolation. It must be viewed in the context of the entire charge. *People v. Housby*, 84 Ill. 2d 415, 433-34 (1981). Decisions concerning defense counsel's choice of jury instructions are characterized as tactical decisions, within the judgment of defense counsel. *People v. Shlimon*, 232 Ill. App. 3d 449, 458 (1992). To convict a defendant of either first-degree murder or second-degree murder, the State must prove beyond a reasonable doubt the elements which constitute the crime of first-degree murder. *People v. Staake*, 2016 IL App (4th) 140638, ¶ 63.  Only after concluding that the State has met its burden, may the trier of fact consider whether a mitigating factor is present, so as to reduce the defendant's conviction from first-degree murder to second-degree murder. *Staake*, 2016 IL App (4th) 140638, ¶ 63.

¶ 57    The Committee Note to IPI Criminal No. 7.02 directs the court to "[u]se Instruction 7.02 to set forth the issues in first degree murder only when the court is not also instructing on the lesser offense of second degree murder." The Note further provides that, "When the court is also instructing on second degree murder, instead of using a separate issues instruction for first degree murder, give the combined issues Instruction [7.06]."

¶ 58    Here, rather than follow the Committee Note's direction, defense counsel tendered both instructions. However, defense counsel modified IPI Criminal No. 7.02 to include language that the State had the burden to prove that defendant was not justified in using the force that he used. Consequently, we agree with the State that there was no chance of jury confusion. Unlike *People v. Ayers*, 331 Ill. App. 3d 742 (2002), the present case does not involve conflicting instructions, where one is a correct statement of law and the other is an incorrect statement of law.

¶ 59    In *Ayers*, one instruction mentioned first-degree murder only and did not address a mitigating factor. The other instruction mentioned both first and second-degree murder and did address a mitigating factor. *Ayers*, 331 Ill. App. 3d at 751. The appellate court in *Ayers* found plain error, reasoning that, based on these conflicting instructions, the jury might have improperly ended its deliberations without considering the defendant's self-defense claim. *Ayers*, 331 Ill. App. 3d at 753.

¶ 60    Unlike in *Ayers*, the issues instructions in the present case were not contradictory. Both issues instructions informed the jury that the State had the burden to prove that defendant was not justified in using the force that he used. Thus, there was no chance of confusion. Additionally, we can infer that the jury was not confused, because it did not send a note inquiring about how to apply the instructions. See *People v. Childs*, 159 Ill. 2d 217, 229 (1994) (explaining that when a jury makes explicit its difficulties, the court should resolve them with specificity and accuracy).

¶ 61    Moreover, we determine that, even if counsel's performance was deficient in tendering both instructions, defendant was not prejudiced because the evidence of defendant's guilt was overwhelming. The testimony from the bar patrons and the bartender supported the State's theory that defendant was guilty of first-degree murder. Neither Rodriguez nor Anya testified to hearing any threats that day. Anya explained, "we were all perfectly fine [until] the incident happened." The bartender, likewise, did not hear any threats. She told Officer Groom and the 911 operator that defendant called the victim over to the door.

¶ 62    The security video furnishes the most significant evidence of defendant's guilt of first-degree murder. It depicts defendant, the victim, Anya, and Rodriguez amicably drinking at the bar for a substantial period of time. Then, defendant, while looking over his shoulder, casually walked to the exit, where he waited. The victim swigged his beer, and then walked to meet defendant at

the exit. During the victim's walk toward defendant, the victim's arms swung at his sides. The video contradicts defendant's testimony that the victim reached toward his waist. When the victim was only a few feet from defendant, defendant fired four shots at the victim. Defendant then looked at the victim lying on the ground before walking to his truck and driving away.

¶ 63   Likewise, defendant's actions after the incident evidenced a guilty conscience. After he fled the scene, defendant hid his gun under a box in the basement of the house where he rented a room. The evidence also showed that the shirt that defendant was wearing ended up in a bucket of liquid that smelled like bleach.  See *People v. Sanchez*, 2013 IL App (2d) 120445, ¶ 35 (explaining that conduct indicating a defendant's consciousness of guilt may serve as circumstantial evidence supporting a conviction).

¶ 64   Defendant's theory, that the victim was a member of La Familia Michoacana, who threatened to kill defendant, was unsupported by the evidence. In his testimony, defendant implied that the victim was connected to an attack on defendant in the Club's parking lot six months before the murder. Defendant also implied that the victim was connected to the cartel's solicitation of defendant to sell cocaine. However, defendant was unable to identify any of the individuals allegedly involved in either the parking lot attack or the cocaine proposition. Indeed, defendant did not connect the victim to the cartel or the parking lot attack, making Dr. De La Cruz's testimony irrelevant. A trier of fact need not accept as true a defendant's testimony, but must consider its probability or improbability, the circumstances surrounding the killing, and other witnesses' testimony. *People v. Lewis*, 2015 IL App (1st) 122411, ¶ 69. Accordingly, we determine that counsel's tender of both jury instructions did not constitute ineffective assistance of counsel.

¶ 65   We next consider whether defense counsel was ineffective in calling Sylvia Alvarez, failing to object to Marisol Alvarez's testimony, and failing to ask the court to suspend jury deliberations.

We consider these issues together, as they all involve purely matters of trial strategy. "Matters of trial strategy are generally immune from claims of ineffective assistance of counsel." *People v. Manning*, 241 Ill. 2d 319, 327 (2011). We are mindful that reviewing courts are highly deferential to trial counsel on matters of trial strategy. *People v. Perry*, 224 Ill. 2d 312, 344 (2007). Consequently, we view counsel's performance from his or her perspective at the time, rather than through hindsight. *Perry*, 224 Ill. 2d at 344.

¶ 66    With respect to Sylvia Alvarez, defendant argues that her testimony—that the victim threatened defendant three times on past occasions—undermined his own credibility as defendant testified that he had never seen the victim before August 1, 2016. Defendant posits that no valid strategy justified counsel's decision to elicit testimony to contradict defendant's own testimony. However, Sylvia was the only witness who substantiated defendant's theory of self-defense.

¶ 67    With respect to Marisol Alvarez, defendant argues that it was error for the State to introduce evidence of the victim's peaceable character in its case-in-chief. Defendant makes the conclusory argument that his counsel was ineffective for failing to object to this improper "character evidence." However, Marisol's testimony rebutted defendant's theory that the victim was a violent member of La Familia Michoacana.

¶ 68    Concerning the jury's request for the transcript of defendant's testimony, defendant argues that informing the jury at 5:08 p.m. that preparation of the transcript would take up to two hours had a coercive effect, as the jury returned a guilty verdict 44 minutes later. Defendant argues that his counsel should have asked the court to suspend jury deliberations until the next morning, when the jury was not "on the clock." However, any notion that the jury felt pressured to reach a verdict is speculation.

¶ 69    As noted, these were all matters of trial strategy. An attorney is ineffective when he fails

to present evidence of which he is aware, to support an otherwise uncorroborated defense. *People v. King*, 316 Ill. App. 3d 901, 913 (2000). In general, whether to call a particular witness is a matter of trial strategy. *People v. Flores*, 128 Ill. 2d 66, 85-86 (1989). Further, the decision of whether to object to the admission of evidence is generally a strategic one that may not form the basis of an ineffective assistance claim. *People v. Smith*, 2014 IL App (1st) 103436, ¶ 63. A defense attorney's basic function is to make the adversarial testing process work. *People v. Domagala*, 2013 IL 113688, ¶ 38. As a result, attorneys have an obligation to explore all readily available sources of evidence that might benefit their clients. *People v. Morris*, 335 Ill. App. 3d 70, 79 (2002).

¶ 70    Defense counsel's strategic decisions are "virtually unchallengeable" and will constitute ineffective assistance only where counsel fails to conduct any meaningful adversarial testing. *People v. Luna*, 2013 IL App (1st) 072253, ¶ 87. Here, even if defense counsel erred in each of the ways complained of, either individually or cumulatively, which we do not decide, defendant cannot demonstrate prejudice because, as described above, the evidence of defendant's guilt was overwhelming. Specifically, as noted, the security video confirms that defendant shot the victim, without provocation, in cold blood. Moreover, the bar patrons and the bartender testified that the victim did not threaten defendant. Also, the police investigation established that the victim was not armed. Although defendant attempted to show a self-defense motive, there was no evidence corroborating his testimony. Accordingly, we determine that defendant cannot satisfy the prejudice prong of *Strickland*. A lack of substantial prejudice is fatal to an ineffective assistance of counsel claim. *People v. Denson*, 2013 IL App (2d) 110652, ¶ 31.

¶ 71                                III. CONCLUSION

¶ 72    For the foregoing reasons, we affirm the judgment of the circuit court of Kane County.

¶ 73    Affirmed.