2024 IL App (1st) 230051-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

FIRST DIVISION
June 24, 2024

No. 1-23-0051

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee | ) ) ) | Cook County, Illinois, Criminal Division. |
| v. | ) ) | No. 16 CR 12457 |
| ERIC BLACK, | ) ) | The Honorable Peggy Chiampas, |
| Defendant-Appellant. | ) ) | Judge Presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Lavin and Coghlan concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The circuit court committed plain error when it provided the jury with conflicting, inconsistent, and contradictory instructions on the element of justification in a closely balanced case that centered on the reasonableness of the defendant's conduct in shooting the two victims.

¶ 2   Following a jury trial in the circuit court of Cook County, the defendant, Eric Black, was found guilty of first-degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2016)) and sentenced to

1

48 years' imprisonment. On appeal, the defendant challenges the sufficiency of the evidence used to convict him. In addition, he argues that the circuit court committed reversible error when it: (1) improperly instructed the jury on the central contested issue in his case; (2) made numerous incorrect evidentiary findings in favor of the State; and (3) permitted the State to shift the burden of proof and misstate applicable law during closing arguments. In addition, the defendant argues that because the circuit court failed to adequately investigate whether the jury was exposed to outside influences or communications, in the very least, we should reverse and remand for a new hearing to determine whether his verdict was impeached. Finally, the defendant contends that his sentence should be reduced because the circuit court improperly applied the 25-year firearm sentencing enhancement (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2016)). For the following reasons, we reverse and remand for a new trial.

¶ 3                                    II. BACKGOUND

¶ 4      On August 22, 2016, the defendant was charged with, *inter alia*, first degree murder and attempted first degree murder for his involvement in the July 17, 2016, shooting at 5024 West Jackson Boulevard in Chicago, which resulted in the death of Artivis Gladney, and serious injuries to Emmanuel Fleming.[1]

¶ 5      The defendant proceeded with the affirmative defense of self-defense. Prior to trial, he filed a motion *in limine* pursuant to Illinois Rule of Evidence 404(a)(2) (eff. January 1, 2011) and *People v. Lynch*, 104 Ill. 2d 194 (1984) seeking to admit certified copies of Fleming's two prior convictions as evidence of his violent character, in order to establish that he, rather than the defendant, was the aggressor in the instant case. Specifically, the defendant sought the introduction

---

[1] Fleming died prior to the defendant's trial. His cause of death was *unrelated* to the July 17, 2016, incident.

of Fleming's: (1) 2014 conviction for unlawful use of a weapon by a felon (UUWF); and (2) 2015 conviction for aggravated assault of a peace officer.

¶ 6    During the hearing, defense counsel pointed out that both convictions had occurred within the last 25 months and were therefore probative of Fleming's propensity for violence. In addition, defense counsel argued that the arrest report in Fleming's 2015 aggravated assault of a peace officer conviction reflected that Fleming obstructed an ongoing police investigation by threatening the police and yelling profanities at them, thereby inciting a small crowd. According to that police report, Fleming had yelled "You scary bitch ass police, get the fuck out of here, I will whip your ass."

¶ 7    In response, the State asserted that during this incident, Fleming "was under the influence of alcohol" and "merely yell[ed]," which is insufficient to show a propensity for violence under *People v. Huddleston*, 176 Ill. App. 3d 18, 28 (1988). The State further added that Fleming's conduct resulted in a Class A misdemeanor charge, to which Fleming pleaded guilty and received a sentence of two days in Cook County jail, time served. The State also asserted that Fleming's 2014 conviction for UUWF was inadmissible because mere possession of a weapon, even if illegal, was insufficient to show a propensity for violence.

¶ 8    After hearing the parties' arguments, the circuit court denied the defendant's motion. The court agreed with the State and held that neither prior conviction showed Fleming's propensity for violence.

¶ 9    In May 2022, the defendant proceeded with a jury trial at which the following relevant evidence was adduced.

¶ 10                          A. Eyewitness Testimony

¶ 11    Fleming's fiancée, Latonya Robinson, first testified that on July 17, 2016, she lived with Fleming, and her seven children at 5024 West Jackson. Five of the children were biological and

two were relatives for whom Robinson acted as guardian. These were 18-year-old Gladney, who was Robinson's fraternal cousin, and his 16-year-old sister, Latoya Ware.

¶ 12    Robinson testified that on the afternoon of July 17, 2016, her family had a barbecue in front of their house. Between about 9 p.m. and 10 p.m., she, Gladney and others were sitting outside when Robinson's neighbor, Kendra, returned home with a girlfriend and began "hollering about her getting into it with somebody the day before."

¶ 13    Robinson went inside to get her children ready for bed. At about 11 p.m., while bathing her children, she heard an "altercation." She came outside and saw a group of ten to fifteen people further down on the corner, "hollering and screaming talking about who jumped my sister." According to Robinson, it looked like Kendra had "come back with a group of people," calling everybody over and claiming that she "got jumped." Robinson averred that together with other neighbors, Gladney and Fleming walked down to the corner to see what was going on. Kendra "want[ed] to fight" but "nobody [was] trying to fight her." Instead, Gladney and Fleming attempted to "diffuse the situation" and explain to the crowd that Kendra had not been "jumped." Robinson believed that they were successful because by the time she reached the corner, "everybody jumped back in the car and left."

¶ 14    As the cars drove off, Gladney and Fleming began walking back to the house and explaining the situation to other neighbors. Robinson, who was standing behind her house between Gladney and Fleming then saw two men walking towards her. The first wore a red sweatshirt and walked past her to her right on the sidewalk. The other, who was tall and skinny, wore a black shirt, and "came from behind the tree or something" and stood in the yard. Neither Gladney, nor Fleming spoke to the two men as they passed her.

¶ 15    A "second or two" later Robinson heard gunshots. She stated that she did not see anyone

4

holding a gun or shooting because she was talking to her neighbor and had her head turned away from the street. As soon as she heard the shots, Robinson ran and hid under a car next to her house. She remained there until the firing stopped.

¶ 16    The State asked Robinson if either Gladney or Fleming "ha[d] a gun" on the night in question, to which she responded in the negative. The State then asked Robinson "Did you ever see Emmanuel Fleming with a weapon?" and "Did you ever see Artivis Gladney with a weapon?" to each of which she responded "No." On cross-examination, the following colloquy took place between defense counsel and Robinson.

"Q:  How well did you know your boyfriend, Emmanuel Fleming?

A: I know him very well. I was with him for eight years.

Q: And you're saying, you are telling the ladies and gentlemen of the jury you never saw a gun?

A: No, he didn't have a gun.

Q: There was never a gun in apartment A of 5024?

A: No, it was not."

¶ 17    During a sidebar, defense counsel argued that the State had "opened the door" to the admission of Fleming's prior UUWF conviction because it had asked Robinson whether she had ever seen Fleming with a gun for the purpose of insinuating that "he is a nonviolent person who doesn't have guns." The State responded that the information was not brought in for that purpose, but rather to show "that [Fleming] was unarmed at the time of the offense and that [Robinson] had never seen him with a weapon." The circuit court agreed with the State and ruled that Fleming's prior UUWF conviction was inadmissible for impeachment purposes.

¶ 18    When Robinson's testimony resumed, she explained that after the shooting stopped, she ran back to her house, where all of her kids were screaming. She then saw Fleming, who had been

shot in the leg and chest, crawling up the porch stairs. Robinson tried to find Gladney and looked for him everywhere, calling his name, until a neighbor came and told her that Gladney was lying on the ground in front of Robinson's window. Robinson went to Gladney and realized that he had been shot and was not moving. On cross-examination, Robinson acknowledged that she would have passed Gladney's body on her way into the house but that she did not see him because it was "that dark," like "black" outside.

¶ 19　Robinson next averred that her five-year-old son called 911 and told the police that his "daddy had been shot." Robinson initially denied calling 911 but after defense counsel played two 911 tape-recordings during cross-examination, she admitted that her five-year-old son's voice was on neither recording. She also claimed that the first tape "sounded like" Ware but ultimately admitted that the voice on the second tape was her own.

¶ 20　At trial, Robinson further averred that on July 18, 2016, the morning after the shooting, she spoke to the police while visiting Fleming in the hospital. She was shown a photo array from which she identified the defendant as the man wearing the red sweatshirt whom she had seen the night before. On cross-examination, Robinson acknowledged that prior to that identification, she had spoken to Fleming about what had happened. Robinson denied searching Kendra's friends on Facebook prior to the identification. When asked if she was absolutely positive that the man in the red sweatshirt was the defendant, she stated, "Like I said when he walked pass me [*sic*] I really didn't see his face. I just saw a red hoodie."

¶ 21　At trial, Robinson further acknowledged that she was relocated by the State's Attorney's Office in 2017.

¶ 22　Gladney's sister, Latoya Ware, who was 16 years old at the time of the incident, next testified that on July 17, 2016, she lived with Robinson, who was her guardian, at 5024 West

Jackson Boulevard. At about 11:45 p.m. Ware was inside the house holding Robinson's newborn baby and taking care of her other siblings, when she heard Robinson and some neighbors arguing outside. A minute or two later, Ware heard six or seven gunshots and dropped to the ground with the baby. About 30 seconds later she got up and saw Fleming inside the house holding his chest and leg wounds. Afterwards, she went outside through the kitchen door together with Robinson whereupon she saw her brother lying on the ground.

¶ 23    Ware denied calling 911 and stated that she could not remember who called them. Ware also denied that she looked out of the window on the night in question. She further stated that she could not recall speaking to any police detectives inside her home later that night or giving them a statement regarding what she had seen through the window.

¶ 24                                B. Police Investigation

¶ 25    Chicago Police Tactical Officers Ryan McCallum and Anthony Pavone next testified that on the evening of July 17, 2016, they were patrolling the area inside their unmarked squad car when they received a call about a shooting at 5024 West Jackson Boulevard. From that call, they learned that the suspects were two black males (one wearing a red sweatshirt and white pants, and the other wearing all black) who were last seen heading northbound on Monroe Street. Within five minutes of touring the area in search of the suspects, the officers observed the defendant, who was wearing a red sweatshirt, and a man wearing dark clothing hiding behind a bush in the back yard of 5016 West Quincy Street. When Officer McCallum shined his car's spotlight onto the defendant, the defendant started running. Officer McCallum exited the car and chased the defendant on foot through the yard and then east on Quincy Street. The officers ultimately apprehended the defendant at 4908 West Quincy Street. After a pat down search, the officers discovered a .40 caliber Glock 22 semiautomatic handgun in the front pocket of the defendant's sweatshirt. The weapon was recovered and inventoried as part of the investigation.

¶ 26    Chicago Police Officer Jon-Michael Fronek next testified that just before midnight on July 17, 2016, he was assigned to protect the crime scene at 5024 West Jackson Boulevard. The officer stated that he canvassed the area and then taped it off with crime-scene tape so that no one could interfere with any evidence. On cross-examination, he stated that he could not recall how long it took him to arrive at the crime scene and admitted that the scene would have remained unprotected until his arrival.

¶ 27    Chicago Police Evidence Technician Darren Foster next testified that sometime after midnight on July 17, 2016, he processed and photographed the crime scene. Among other things, Foster recovered three nine-millimeter shell casings and two .40 caliber shell casings about 20 to 30 feet away from Gladney's body. Based on the five shell casings of two different calibers the police believed that at least two guns had been used in the shooting. Foster testified, however, that there were no weapons near or underneath Gladney's body and that the police never recovered a second weapon during their investigation. On cross-examination, he acknowledged, however, that when he arrived at the crime scene, there was a blue blanket covering Gladney's body, which was likely placed there by a civilian.

¶ 28    Chicago Police Detective Vincent Alonzo, who was assigned to investigate the shooting at 5024 West Jackson Boulevard on July 17, 2016, arrived at the crime scene after the two suspects had already been apprehended by the police. He stated that once there, he first interviewed Robinson. When the State inquired what the defendant had learned from Robinson, defense counsel objected on hearsay grounds. The State responded that the evidence was being offered to show the course of the police investigation, and the circuit court allowed the testimony for that limited purpose.

¶ 29    Detective Alonzo then testified that he learned that "while standing in front of the residence, two males approached the scene. They passed by where [Robinson] was standing in the

direction of the two victims. Both of them produced handguns and began shooting at the victims and then fled the scene." When the State asked how the shooters were dressed, defense counsel again objected on hearsay grounds, to which the court responded, "My previous ruling will stand." The detective then testified that he heard over the radio "that one of the suspects was wearing a red shirt or sweatshirt with light or white colored pants and the other one was wearing all black."

¶ 30 Detective Alonzo next testified that on the following morning, he asked Chicago Police Detective Adrian Garcia to assist him in administering a photo array to Robinson inside the hospital where Fleming was being treated. Detective Garcia testified that when he showed the photo array to Robinson, she identified the defendant as "one of the shooters wearing a red hoodie."

¶ 31 Detective Alonzo next averred that a few weeks after the shooting, on July 27, 2016, he returned to Robinson's home to serve her and Fleming with a subpoena. At that point, Robinson informed him that her ward, Ware, had some information for him. This was the first time that the detective was made aware that Ware had witnessed anything. When the State asked the defendant what he had learned when he spoke to Ware, defense counsel objected on hearsay grounds. The State explained that it was "proving up the impeachment" of Ware's testimony. Defense counsel objected to the State impeaching its own witness, but the circuit court overruled the objection.

¶ 32 Detective Alonzo then testified that Ware told him that she was inside her house on the evening of the shooting when she heard a loud noise outside and looked out the window. Ware told the detective that she saw a black man wearing a red hooded sweatshirt and light-colored pants aiming and shooting towards the ground at Gladney, who was lying there.

¶ 33 On cross-examination, Detective Alonzo admitted that he never memorialized Ware's statement in writing, that he never showed her a photo array and that she never testified before the grand jury. He also admitted that he never memorialized Robinson's statement that she saw the individual in the red sweatshirt holding a gun and shooting. The officer claimed that another

9

detective memorialized Robinson's statement, but the statement was not introduced into evidence at trial.

¶ 34    During a subsequent break in the trial, defense counsel moved for a mistrial on the grounds that the court had improperly allowed the State to impeach its own witnesses with prior inconsistent statements. The circuit court denied the motion ruling that "the witness[es had] denied making statements" and that the State was therefore "allowed to perfect that impeachment."

¶ 35    After the break, Detective Alonzo continued his testimony. He averred that as part of his investigation on the night of the shooting, he obtained surveillance video footage from a camera at 5023 West Jackson Boulevard, which was across from Robinson's home. That video footage was introduced into evidence and played for the jury while the detective narrated the events.

¶ 36    The four-minute video footage is black and white, with no sound and of poor resolution. The video solely depicts the minutes leading up to the shooting and not the shooting itself. In numerous sections, tree branches and the glare from the headlights of passing vehicles interfere with visibility. The relevant events are seen from across the boulevard, such that all individuals are small, blurry, and barely identifiable.

¶ 37    During his narration, Detective Alonzo first testified that the video reflects that it was raining heavily that night. He then stated that at 23:38:28 p.m., a group of six or seven people are seen in the left-hand corner of the video walking on the opposite side of the street from the camera, westwards towards 5024 West Jackson Boulevard. Afterwards, two men are seen walking on the opposite side of the street in the same direction, one appearing to wear all black and the other wearing a light-colored shirt and white pants. According to Detective Alonzo, all of the individuals exit the footage. At 23:40 p.m. the video depicts people scattering and fleeing the location.

¶ 38    During the detective's narration of the video footage, the State asked him to approach the screen, look closer, and determine whether the man in the white pants was moving his arm towards

anything about 30 seconds before he is seen walking off camera and everyone scatters. Detective Alonzo responded in the affirmative and stated that the individual was moving his left arm towards the waist area of his sweatshirt.

¶ 39    On cross-examination, Detective Alonzo admitted that the video footage was blurry, that the two men in the footage appear very far away, and that none of his police reports include a statement that the video depicts the individual in lighter clothing moving his arm towards the waist area of his sweatshirt prior to the shooting.[2]

¶ 40    On cross-examination, Detective Alonzo further admitted that the second individual hiding in the bushes with the defendant on the night of the shooting was arrested and identified as Randy Smith. The detective acknowledged that Smith had no gun on his person and was therefore never charged with any crime.

¶ 41                                   C. Forensic Evidence

¶ 42    Cook County Deputy Chief Medical Examiner, Dr. Kristin Escobar Alvarenga, next testified that on July 18, 2016, she performed the autopsy on Gladney. She testified that Gladney sustained six gunshot wounds, four perforating (with exit wounds) and two penetrating (with no exit wounds). According to Dr. Alvarenga the penetrating wounds included: (1) a wound to the back of Gladney's head where the bullet traveled "back to front and downwards" and was recovered from Gladney's head; and (2) a wound behind the left ear where the bullet travelled "downward and slightly back to front" and was recovered from Gladney's neck. The perforating wounds included: (1) a wound to the right buttock with a "path [that] was directed back to front" and "downward"; (2) a wound to the outside of the right heel where the bullet traveled "[b]ack to

---

[2] Our review of the video surveillance footage reveals that it is unclear what the person in white clothing is doing prior to exiting the camera frame. The video is too blurry and the person too small in the footage.

front"; (3) a wound to the lateral left thigh where the bullet travelled "upwards and left to right"; and (4) a wound to the right hand, where the bullet travelled "upward and left to right." Dr. Alvarenga explained that the path of the bullet "gives a general idea" of the "direction the bullet came from *** and what was exposed at the time that [Gladney] was shot." As such, "[g]iven that the wounds were located at the back of [Gladney's] head and his buttocks, those areas were exposed when he was shot." Dr. Alvarenga admitted that the wounds could have been inflicted by Gladney turning or moving away from the shooter. Ultimately, Dr. Alvarenga opined that Gladney died from multiple gunshot wounds and that the manner of death was homicide.

¶ 43     On cross-examination, Dr. Alvarenga admitted that she found no "stippling" on Gladney's body during the autopsy. She explained that "stippling" is a type of injury, which is indicative of close-range fire, *i.e*., between two to three feet. On redirect examination, she clarified that for "stippling" to occur the skin has to be exposed.

¶ 44     Illinois State Police firearms expert, Gregory Hickey, next testified that he examined and test-fired the .40 caliber Glock that was recovered from the defendant and determined that the two .40 caliber fired cartridges found at the scene of the crime were fired from that weapon. Hickey further testified that he compared the two bullets recovered from Gladney's head and neck during the autopsy to the .40 caliber Glock and determined that they had "class characteristics" consistent with the Glock. Hickey also testified that the nine-millimeter fired cartridge cases found at the crime scene were not fired from the Glock.

¶ 45     After the State rested its case-in-chief, defense counsel once again renewed his request to introduce evidence of Fleming's prior UUWF conviction to rebut Robinson's testimony that she never observed Fleming with a weapon, but that request was denied. Defense counsel then moved

for a directed finding, arguing that the State failed to present sufficient evidence to sustain a conviction of first-degree murder. This motion was similarly denied.

¶ 46                                   D. The Defendant's Testimony

¶ 47    The defendant then proceeded with his case-in-chief, testifying on his own behalf. The defendant stated that on the evening of July 17, 2016, he was driving in his car with his pregnant fiancée, Alexandria King, and his friend, Randy Smith, when he received a phone call from his friend, Kendra, who was crying. Defense counsel attempted to ask the defendant what Kendra had said over the phone, to show what effect it had on the defendant, but the circuit court sustained the State's hearsay objection. The defendant stated that after receiving Kendra's call, he proceeded to Kendra's house on the 5000 block of West Jackson Boulevard because "[Kendra] said it was a group of individuals." When defense counsel attempted to ask him why, the State's objection was sustained.

¶ 48    The defendant testified that once there, he parked the car on a side street. While his fiancée remained in the parked car, the defendant and Smith walked westwards on Jackson Boulevard towards Kendra's house. As they were walking on the sidewalk, they were approached by two black men, whom the defendant had never met before. According to the defendant, the younger of the two had his hands behind his back while the older one fidgeted with his waistband and said, "I told that bitch she better not call nobody over here on this block." At that point, a third man approached from behind the defendant and said, "I hope y'all got enough shots." The defendant stated that the older man then took a gun out of his waistband and holding it with both hands, pointed it directly at him. At the same time, the younger man brought his hands from behind his back. At that moment, the defendant thought he was going to die so he pulled out his own gun and

started shooting in the direction of the two men. He did not know how many shots he fired or where exactly they flew.

¶ 49    The defendant then fled with Smith because he heard gunshots from behind him. He did not know who was shooting at him but acknowledged that he never saw the younger man holding a gun. He explained that the entire encounter between the time when he was approached by the two men and when he fired his shots in fear for his life lasted less than 30 seconds.

¶ 50    After fleeing through a building, the defendant and Smith hid in some bushes in a vacant lot. While they were hiding, a vehicle approached and flashed its lights at them. The defendant did not know who was inside the vehicle, so he ran. The defendant acknowledged that he was subsequently arrested by the police and that they retrieved his gun. He denied that Smith had any weapon on him on the night in question or that he fired any shots.

¶ 51    On cross-examination, the defendant acknowledged that he wore a red sweatshirt on the night in question and that Smith wore all black. He further admitted that the surveillance video footage introduced by the State shows him walking westward on Jackson Boulevard with Smith prior to the shooting. He stated, however, that his encounter with the two men happened off camera prior to the people in the footage seen dispersing.

¶ 52    On redirect examination, defense counsel again attempted to ask the defendant why he went to Kendra's house in the first place to which the defendant answered, "to check on the well-being of Kendra." The State again objected on hearsay grounds, and the court sustained the objection. During the subsequent sidebar, defense counsel argued that Kendra's out-of-court statements to the defendant went to the defendant's "state of mind of why he went or did what he did that night." The State responded that the defendant's self-defense claim had "absolutely nothing to do with Kendra," and that the defendant was "meeting unknown individuals on a

14

sidewalk," so that he could not use what he thought about Kendra to give himself a self-defense on two other people. Defense counsel then proffered that the defendant would testify that Kendra told him "something along the lines that her neighbors were bullying her and not letting her into his apartment" and stated, "it goes to [the defendant's] state of mind of why he would even travel to the 5000 block of West Jackson that night." The court disagreed and sustained the hearsay objection.

¶ 53    After the defendant's testimony, defense counsel moved for a mistrial on the ground that the court had improperly excluded evidence of the defendant's state of mind. The circuit court denied the motion. Defense counsel then requested a continuance to introduce new evidence in support of its defense. Counsel stated that it had just learned that Robinson was the named victim in one of Fleming's prior arrests and convictions, during which a gun was recovered from his person. Counsel stated that he intended to impeach Robinson by having her testify "that [Fleming] had a gun, that he told the police he always carries a gun," and asked the court for a continuance unless Robinson was available now. The court denied the request, reiterating that it had already ruled on this issue and that a UUWF conviction was not evidence of propensity for violence and could not be used for impeachment purposes, where Fleming never testified at trial.

¶ 54    After the parties' closing arguments, the circuit court instructed the jury with the relevant legal standards. The court's instructions included, among other things, Illinois Pattern Jury Instruction, Criminal No. 7.01 (4th ed. 2000) (hereinafter IPI 7.01) an instruction which defines first degree murder, Illinois Pattern Jury Instruction, Criminal No. 7.02 (4th ed. 2000) (hereinafter IPI 7.02), which is a first-degree murder issue instruction when second degree murder is not also an issue in the case, and Illinois Pattern Jury Instruction, Criminal No. 7.06 (4th ed. 2000) (hereinafter IPI 7.06), which is a first and second degree murder issues instruction. The jury was

also given Illinois Pattern Jury Instruction, Criminal No. 7.05 (4th ed. 2000) (hereinafter IPI 7.05), which defines a mitigating factor for purposes of second-degree murder and Illinois Patter Jury Instruction, Criminal No. 24-25.06 (4th ed. 2000) (hereinafter IPI 24-25.06), a self-defense instruction.

¶ 55    The definitional instruction of first-degree murder did not include the phrase "without lawful justification" and instead stated only:

> "A person commits the offense of first degree murder when he kills an individual if, in performing the acts which cause the death, he intends to kill or do great bodily harm to that individual; or he knows that such acts will cause death to that individual; or he knows that such acts create a strong probability of death or great bodily harm to that individual." IPI 7.01.

The definitional instruction of attempted first degree murder, on the other hand, stated that "[a] person commits the offense of attempt first degree murder when he, *without lawful justification and* with the intent to kill that individual, does any act which constitutes a substantial step toward the killing of an individual." (Emphasis added.) Illinois Pattern Jury Instruction, Criminal No. 6.05X (4th ed. 2000) (hereinafter IPI 6.05X).

¶ 56    The self-defense instruction stated:

> "A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend himself against the imminent use of unlawful force.
>
> However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself." IPI 24-25.06.

16

¶ 57    The jury was also instructed that "under the law" a person who is charged with first degree murder may be found (1) not guilty of first-degree murder; or (2) guilty of first-degree murder; or (3) guilty of second-degree murder. Illinois Pattern Jury Instruction, Criminal No. 2.0B (4th ed 2000) (hereinafter IPI 2.0B). The jury was told that if the State proved "beyond a reasonable doubt that the defendant" was "guilty of first-degree murder" the burden fell on the defendant to prove by "a preponderance of the evidence that a mitigating factor" was present such that he was guilty "of the lesser offense of second degree murder, and not guilty of first degree murder." Illinois Pattern Jury Instruction, Criminal No. 2.03A (4th ed. 2000) (hereinafter IPI 2.03A).

¶ 58    The jury was then provided with two separate issues instructions on first-degree murder. The first instructed the jury that to sustain the charge of first-degree murder the State had to prove the following:

"First Proposition: That the defendant performed the acts which caused the death of *** Gladney; and

Second Proposition: That when the defendant did so,

he intended to kill or do great bodily harm to *** Gladney; or

he knew that his acts would cause death to *** Gladney; or

he knew that his acts created a strong probability of death or great bodily harm to *** Galdney; and

Third Proposition: that the defendant was not justified in using the force that he used.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty. If you find from your consideration of all the evidence that any one of these

17

propositions has not been proved beyond a reasonable doubt, you should find the defendant

not guilty." IPI 7.02.

The second jury instruction informed the jury that to sustain a charge of *either* first- or second-degree murder, the State had to prove the same three aforementioned propositions and then go on to consider the following:

"If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, your deliberations on these charges should end, and you should return a verdict of not guilty of first degree murder.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, then you should go on with your deliberations to decide whether a mitigating factor has been proved so that the defendant is guilty of the lesser offense of second degree murder instead of first degree murder.

You may not consider whether the defendant is guilty of the lesser offense of second degree murder until and unless you have first determined that the State has proved beyond a reasonable doubt each of the previously stated propositions.

The defendant has the burden of proving by a preponderance of the evidence that a mitigating factor is present so that he is guilty of the lesser offense of second degree murder instead of first degree murder. By this I mean that you must be persuaded, considering all the evidence in this case, that it is more probably true than not true that the following mitigating factor is present ***: that the defendant, at the time he performed the acts which caused the death of *** Gladney believed the circumstances to be such that they justified the deadly force he used, but his belief that such circumstances existed was unreasonable.

18

If you find from your consideration of all the evidence that the defendant has proved by a preponderance of the evidence that a mitigating factor is present so that he is guilty of the lesser offense of second degree murder instead of first degree murder, *you should find the defendant guilty of second degree murder.*

If you find from your consideration of all the evidence that the defendant has *not* proved by a preponderance of the evidence that a mitigating factor is present so that he is guilty of the lesser offense of second degree murder instead of first degree murder, *you should find the defendant guilty of second degree murder.*" (Emphasis added.) IPI 7.06.

¶ 59 The jury began its deliberations at 3:08 p.m. In the next five hours, the jury sent out three notes to the judge. At 3:32 p.m., the jury asked the court, "Can we each have a copy of the laws?" to which the court responded that the jury had the laws and the evidence and should continue to deliberate. At 3:54 p.m., the jury asked, " 'Is justification only'—underlined four times— acceptable in a self-defense case?' "[3] The circuit court instructed the jury in the following manner: "You have the instructions regarding justification and its applicability. Please continue to deliberate."

¶ 60 At 6:43 p.m., the jury sent its third note asking, "What is the cutoff time to remain in deliberation before being dismissed for the day and return tomorrow?" The judge informed the parties that she would permit the jury to decide how long they were willing to deliberate. Then, on record, she noted that she had just been informed by the deputy that one of the jurors had to step outside of the jury room for a minute "to get some air." The judge added, "She stepped outside in the hallway here and then went right back in. It's a little claustrophobic back there."

---

[3] While the actual jury note is not part of the common law record, the transcript of the proceedings reveals that according to the judge, the word "only" in the jury's note was underlined four times.

¶ 61    After the jury was brought back into the court room, the judge informed the jurors that she generally did not permit deliberations to go past 9 or 9:30 p.m., especially on a day like this one, where the jury had been in the courtroom since 9 a.m. The judge asked the jurors to go back to the jury room and decide how long they wanted to deliberate. After a short break, the jurors informed the judge that they had agreed to stay until 9 p.m. and to revisit the issue if they could not reach a verdict until then.

¶ 62    At 7:50 p.m., the jury returned with a verdict, acquitting the defendant of the attempted first-degree murder of Fleming but finding him guilty of the first-degree murder of Gladney. The jury also found that the defendant personally discharged the firearm during the commission of this offense.

¶ 63    After the verdict was read, the circuit court polled the jury and each juror indicated that he or she agreed with the verdict. Immediately after the polling, Juror 11 stood up and left the courtroom. The judge then told the deputy and defense counsel that she "just want[ed] to make sure that juror [was] ok," to which defense counsel responded, "I'm concerned too, Judge." The judge then recalled Juror 11 and permitting her to remain at the door of the courtroom, asked "Ma'am, I'm just going to ask you one more time because I know you had to use the facilities. Was this then and is this now your verdict?" Juror 11 answered, "Yes."

¶ 64    On the following morning, at 9:40 a.m., the judge received two telephone messages from Juror 22 asking to speak to her. When the judge returned the call, Juror 22 related, in summary, and not verbatim "that she didn't believe she had all the information" and that "she didn't understand *** some things." The judge asked Juror 22 whether she had affirmed the verdict when polled, and Juror 22 answered in the affirmative. When the judge asked "[W]hat is the issue?" Juror 22 "indicated that she was hung up on the premeditation thing." The judge immediately ended the conversation with Juror 22 and called the parties for a hearing at which she related her

20

interaction with the juror.

¶ 65    During this hearing, defense counsel stated, "I don't know if [Juror 22] was improperly influenced in the jury room or what, and I think it's worth following up." In support, and with no objection from the State or the judge, defense counsel made a record of what transpired during the deliberations and the subsequent polling of the jurors. As defense counsel explained:

> "There had earlier been a request for individual copies of the law. We didn't quite understand that question. Based on this call from the juror I'm beginning to think that they were looking for jury instructions.
>
> When the jury came back the polling was relatively unusual in that I believe I saw at least four jurors, perhaps more, red faced and apparently crying.
>
> During the polling of the jury one lady got out of the box, jury box, and scurried to the back where we saw her crying and leaning up against the wall. The Court then took kind of a little break in place, and the juror was brought back, and I think the Court asked her are you okay, and she said yes.
>
> ***
>
> One other thing. After the verdict was entered, I know the Court went back and spoke to the jury for I would say at least five or ten minutes, and I don't know what was discussed back then."

The judge acknowledged that she went back to the jury room and spoke to the jurors for about 15 minutes after polling them but stated that at no time during that conversation any juror approached her to indicate that "there was a difference in what their verdict was."

¶ 66    Defense counsel then asked to *voire dire* Juror 22. The judge ordered the parties not to contact Juror 22 and to put any requests relating to that juror in writing.

¶ 67    On the next court date, defense counsel filed a written motion asking that Juror 22 be

"brought back to the Court where she could be questioned by the defense regarding her need to call the Court and to further explain what if any problem she had with the verdict." The motion further requested that the court vacate its prior order precluding the parties from interviewing Juror 22.

¶ 68    A hearing on the motion was held on May 12, 2022. At that hearing, defense counsel indicated that he would "stand on the motion." The State then argued that Juror 22's comments "did not complain of any outside influences, but instead talked about the deliberative process of the jury" and were thus irrelevant and not admissible to impeach the verdict. In response, defense counsel explained that he was not attempting to impeach the verdict but instead merely to remove the court's order banning him from speaking with Juror 22 so that he could follow up on her phone call to the judge and investigate what was "on the juror's mind." He further indicated that he would not harass anyone and that he would speak to the juror only if the juror agreed.

¶ 69    The court denied the defendant's motion, finding that there was no indication that there were extraneous influences on the jury and that Juror 22 was "basically having buyer's remorse," which was not a valid reason to impeach the verdict.

¶ 70    At a subsequent court hearing, the State reversed course and agreed with defense counsel that Juror 22 should be brought in for questioning. The State noted that since the defendant had raised this issue in his posttrial motion "because of any potential postconviction relief, I believe we do need to bring [Juror 22] in and you [*sic*] talk to the juror." The State further explained: "I believe when [Juror 22] called and she said she was confused about premeditation, she may have been doing research on her own because none of the jury instructions we gave you had the word 'premeditation,' and that's what she was hung up on." The circuit court disagreed and denied the State's request to bring Juror 22 to court for questioning.

¶ 71    The circuit court then sentenced the defendant to a total of 48 years' imprisonment, including 23 years for first degree murder and 25 years for the firearm enhancement.

¶ 72    The defendant now appeals.

¶ 73                                    II. ANALYSIS

¶ 74    On appeal, the defendant makes six contentions. First, he argues that the State failed to prove beyond a reasonable doubt that he did not act in self-defense when he shot Gladney, or, in the very least, that the evidence was sufficient only for a second-degree murder conviction. Second, he argues that the circuit court provided the jury with confusing and conflicting jury instructions regarding first- and second-degree murder, resulting in a failure to correctly convey the applicable law. Third, the defendant asserts that the circuit court made the following erroneous evidentiary findings, which impeded his constitutional right to present his defense: (1) prohibiting the introduction of Kendra's phone call pursuant to the state-of-mind exception to the hearsay doctrine; (2) barring the introduction of Fleming's prior aggravated assault of a peace officer conviction to show his propensity for violence under *Lynch*, 104 Ill. 2d 194, and his UUWF conviction to impeach Robinson, after she testified that she never saw him with a weapon; and (3) permitting the State to introduce inadmissible and highly prejudicial evidence of Ware's and Robinson's inconsistent statements to Detective Alonzo for impeachment purposes. Fourth, the defendant contends that the State made improper remarks in opening and closing arguments that invaded the province of the jury, shifted the burden of proof and misstated the applicable law. Fifth, the defendant contends that because the circuit court failed to adequately investigate whether the jury was exposed to outside influences, in the very least, we must remand for a new hearing to determine whether the verdict was impeached. Sixth, the defendant asks that we reduce his 48-

year sentence to 43 years, because the circuit court improperly applied the relevant firearm enhancement.

¶ 75    Because we find it to be dispositive, we first address the defendant's contention regarding improper jury instructions. In this respect, the defendant contends that the jury was given conflicting and confusing jury instructions relating to first- and second- degree murder resulting in a failure to correctly convey applicable law.

¶ 76    The State initially responds, and the defendant concedes that he has forfeited this issue for purposes of appeal because his defense counsel failed to object to the jury instructions in the circuit court. See *People v. Thompson*, 238 Ill. 2d 598, 611 (2010); see also *People v. Herron*, 215 Ill. 2d 167, 175 (2005) (a defendant forfeits review of any alleged jury instruction error if he does not object to the instruction or offer an alternative and does not raise the issue in a posttrial motion.) The defendant nonetheless asks us to review the matter under Illinois Supreme Court Rule 451(c) (Ill. S. Ct. R. 451(c) (eff. Apr. 8, 2013)) or in the alternative, grant him relief based upon ineffective assistance of his trial counsel.

¶ 77    Supreme Court Rule 451(c) provides that "substantial defects" in jury instructions "are not waived by failure to make timely objections thereto if the interests of justice require." Ill. S. Ct. R. 451(c) (eff. Apr. 8, 2013). "This rule is meant to correct grave or serious errors and errors in cases so factually close that fundamental fairness requires that the jury be properly instructed." *People v. Anderson*, 2012 IL App (1st) 103288, ¶ 43 (citing *People v. Sargent*, 239 Ill. 2d 166, 189 (2010)). Supreme Court Rule 451(c) is "coextensive" with the plain-error clause in Supreme Court Rule 651(a), which provides that " '[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court.' " *Sargent*, 239 Ill. 2d

24

166, 189 (quoting Ill. S. Ct. R. 615(a)). Accordingly, when a defendant invokes review under Rule 451(c), we utilize the plain error doctrine to review his claim of error. *People v. Durr*, 215 Ill. 2d 283, 296-97 (2005).

¶ 78    Under the plain error doctrine, we may consider an unpreserved error when there was a clear and obvious error and either (1) the evidence was so closely balanced that the error itself threatened to tip the scales of justice against the defendant, regardless of the gravity of the error, or (2) the error was so serious that it resulted in an unfair trial to the defendant and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Sebby*, 2017 IL 119445, ¶ 48. In either scenario, the burden of persuasion remains with the defendant. *Herron*, 215 Ill. 2d at 187.

¶ 79    The first step in any plain error analysis is to determine whether there was a clear or obvious error. *Sebby*, 2017 IL 119445, ¶ 48.

¶ 80    The purpose of jury instructions is to convey the correct, applicable legal principles to the jury so that it may arrive at a correct conclusion under the law and the evidence presented. *People v. Robinson*, 2016 IL App (1st) 130484, ¶ 40; *People v. Bannister*, 232 Ill. 2d 52, 81 (2008); *People v. Fuller,* 205 Ill. 2d 308, 343 (2002). Jury instructions should not be misleading or confusing and the jury must be instructed on the elements of a charged offense. *Id.*; see also *People v. Bush*, 157 Ill. 2d 248, 254 (1993). This court reviews *de novo* whether the jury instructions, as a whole, accurately stated the law. *People v. Mitchell*, 2018 IL App (1st) 15335, ¶ 41; *People v. Ayoubi*, 2020 IL App (1st) 180518, ¶ 53. Our review of the circuit court's decision to give a particular jury instruction, however, is for an abuse of discretion. *Id*.

¶ 81    In the present case, on appeal, the defendant contends that contrary to the clear directive of the committee notes for IPI 7.01, in instructing the jury the circuit court improperly omitted the

25

phrase "without lawful justification" from the definitional instruction of first-degree murder. See IPI 7.01, Committee Note at 1 (directing the parties to "use the phrase 'without lawful justification' whenever an instruction is to be given on an affirmative defense contained in Article 720."). In addition, the defendant contends that the circuit court erred by giving the jury both IPI 7.02 (the issues instruction for first degree murder) and IPI 7.06 (the issues instruction for first- and second-degree murder). In this respect, the defendant contends that the committee note for IPI 7.02 clearly provides that this instruction is to be used "only when the court is not also instructing on the lesser offense of second degree murder" and that instead, in a situation where second degree murder is at issue at trial "the combined issues Instruction 7.04 or 7.06" should be given. See IPI 7.02, Committee Note at 9. The defendant asserts that together these instructional errors confused the jury and failed to instruct it on the correct applicable law regarding second degree murder. He points out that the jury's confusion is evident from the notes that it sent to the judge during its deliberations, as well as the subsequent contact Juror 22 made with the judge. The defendant therefore asserts that we must reverse and remand the matter for a new trial.

¶ 82     The State concedes that the circuit failed to follow the committee notes for IPI 7.01 and 7.02 and that it abused its discretion in tendering the three erroneous instructions to the jury. The State, nonetheless, asserts that these instructional errors were harmless because the non-justification element was included in the defendant's charge, the parties' remarks in opening and closing arguments, and the remaining instructions given to the jury. The State further asserts that when "considered as a whole" the jury instructions were neither conflicting nor confusing, and instead clearly informed the jury regarding the applicable law. For the following reasons, we disagree.

¶ 83    In that respect, we find the decision in *People v. Ayres*, 331 Ill. App. 3d 742, (2002) instructive. In that case, just as here, the defendant was charged with first degree murder but raised self-defense at trial. *Id.* at 750. In instructing the jury on first degree murder, the circuit court failed to include the phrase "without lawful justification" in its definitional instruction (IPI 7.01) and instead included that language in its issues instruction (IPI 7.06). In addition, the court provided the jury with both IPI 7.02, which according to the committee notes applies only "when second degree murder is not also an issue" in the case, and IPI 7.06, the issues instruction for first- and second-degree murder. *Id.* Of these instructions only IPI 7.06 informed the jury that it could find the defendant guilty of first-degree murder if it first found that the defendant was not justified in using the force he employed. *Id* at 747. The appellate court in *Ayres* held that this particular combination of instructional errors forced the jury to "choose between two contradictory instructions which related to a central issue in the case," namely "self-defense," and that "[b]ased on these instructions the jury could have improperly ended its deliberations without considering [the defendant's] self-defense argument and convicted [him] on the basis of the incorrect instruction." *Id.* at 750. The court held that this was not a harmless error and that reversal and remand for a new trial was necessary. *Id.* at 753-54.

¶ 84    In doing so, the *Ayres* court relied on our supreme court's decision in *People v. Jenkins*, 69 Ill. 2d 61 (1977). In that case the central issue at the defendant's trial for attempted murder was whether the level of force the defendant had used was justified. *Jenkins*, 69 Ill. 2d at 64-65. The circuit court gave the jury two attempted murder issues instructions. *Id.* The first instructed the jury to find the defendant guilty of attempted murder if the defendant performed an act that constituted a substantial step towards the commission of the crime of murder and he had the intent to commit murder, and omitted any reference to the fact that the defendant must not have been

justified in using the force he employed. *Id*. The second instruction correctly stated the law and informed the jury that to find the defendant guilty it also had to find that the defendant was not justified in using the force he employed. *Id.*

¶ 85    Our supreme court held that each of these instructions was self-contained and differed from the other so as to be inconsistent and contradictory. *Id*. at 66. Accordingly, because the circuit court has the duty to inform the jury as to the law, where the instructions are contradictory, the jury cannot perform its constitutional function. *Id.* As our supreme court explained:

"This inability is the fault of the court, whose duty it is to give the jury proper guidance, not to generate confusion, as was the case here. It is well established that the giving of contradictory instructions on an essential element in the case is prejudicial error, and is not cured by the fact that another instruction is correct. While it is true that an instruction may be inaccurate, and other instructions may remove this error, such cannot be so when the instructions are in direct conflict with one another, one stating the law correctly and the other erroneously. This is particularly true where the instruction defines the issues in the case or is mandatory in character. [Citations.]

Where the instructions are contradictory[,] the jury is put in the position of *** having to select the proper instruction[,] a function exclusively that of the court. As far as can be known, defendant might well have been convicted on the basis of the erroneous instruction. Certainly, a person should not stand to lose his liberty because a jury has received equivocal instructions." *Id.* at 66-67.

¶ 86    Just as in *Jenkins* and *Ayres*, in the present case the confluence of contradictory and erroneous jury instructions regarding first- and second-degree murder prejudiced the defendant requiring reversal for a new trial. Here, just as in *Ayres*, even though the defendant argued self-

28

defense at trial, the court's definitional instruction of first-degree murder (IPI 7.01) failed to include the language "without lawful justification." This error removed the State's burden of proof regarding a requisite element of first-degree murder and gave the jury the false impression that, in order to find the defendant guilty, it did not have to consider whether the defendant's conduct was justified and, if so, to what extent. The error was further compounded by the fact that the definitional instruction of attempted first degree murder (IPI 6.05X) included the requisite language "without lawful justification," thereby signaling to the jury that this element was necessary for the attempted murder charge, but not to find the defendant guilty of first-degree murder.

¶ 87    Moreover, the court improperly instructed the jury with both IPI 7.02 and IPI 7.06. While it is true that IPI 7.02 was amended here such that both issues instructions included language indicating that the State bore the burden of showing that the defendant was not justified in using the force he did, only IPI 7.06 provided any guidance on the steps needed to reach second degree murder, informing the jury that to find the defendant guilty of second degree murder the defendant had to show by a preponderance of the evidence the presence of a mitigating factor, specifically the defendant's unreasonable belief that the circumstances justified his use of deadly force. Glaringly, however, IPI 7.06, as given, incorrectly stated the law with respect to the defendant's burden of proof on that mitigating factor. Specifically, both the written instruction and the judge's oral directive to the jury stated the following:

> "If you find from your consideration of all the evidence that the defendant has proved by a preponderance of the evidence that a mitigating factor is present so that he is guilty of the lesser offense of second degree murder instead of first degree murder, *you should find the defendant guilty of second degree murder.*

29

> If you find from your consideration of all the evidence that the defendant has *not* proved by a preponderance of the evidence that a mitigating factor is present so that he is guilty of the lesser offense of second degree murder instead of first degree murder, *you should find the defendant guilty of second [sic] degree murder.*" (Emphasis added.) IPI 7.06.

¶ 88   As is evident from the above, the jury was incorrectly instructed that regardless of whether the defendant proved by a preponderance of the evidence the presence of the relevant mitigating factor, he should be found guilty of second-degree murder. This completely contradictory oral and written instruction could have only acted to confuse the jury, leading them to conclude that it was easier to use only IPI 7.02 and convict the defendant of first-degree murder than attempt to discern whether and to what extent the defendant reasonably believed that his conduct was justified. This is evident from the numerous questions that the jury sent to the judge during deliberations. The jury's first question "Can we each have a copy of the laws?" was followed 20 minutes later by " 'Is justification only'—underlined four times—'acceptable in a self-defense case?' " Each time, the jury was informed that they had the instructions regarding the applicable law and that they should continue to deliberate. And yet, the jury did not have the correct laws. Moreover, on the morning following the deliberations, one juror repeatedly telephoned the judge expressing her concern that during deliberations, she did not have all the information, did not understand some things, and "was hung upon the premeditation thing."

¶ 89   Under this record, where the only contested issue at trial was whether the evidence established that the defendant was not justified in using deadly force and thus was guilty of first degree murder, and, if not justified, whether he was guilty of second degree murder because of an unreasonable belief in self-defense, there can be no doubt that the combination of the conspicuous

omission of the phrase "without lawful justification" from the definitional instruction of first-degree murder (IPI 7.01), its presence in the definitional instruction of attempted first degree murder (IPI 6.05X), and the inaccurate and confusing statement of law regarding the defendant's burden of proof regarding justification in the combined first- and second-degree murder issues instruction (IPI 7.06), prejudiced the outcome of the defendant's trial.

¶ 90    Moreover, and significantly, the evidence at trial was closely balanced. The only direct testimony regarding what transpired on the night of the shooting came from the defendant himself. The defendant testified that Fleming and Gladney accosted him in the street and belligerently questioned his presence in the neighborhood on behalf of Kendra. Gladney was holding his hands behind his back, while Fleming was fidgeting with his waistband when a third individual stepped out from behind the defendant and stated, "I hope you all have enough shots." The defendant testified that Fleming then pulled out a gun and pointed it directly at him, while Gladney moved his hands from behind his back. At that point, the defendant believed that he was going to die so he pulled out his own gun, which he always carried for protection, and shot in the direction of Fleming and Gladney. Hearing shots from behind he ran and hid in some bushes. When a vehicle subsequently approached and turned its lights on him, the defendant fled because he did not know who was inside.

¶ 91    To counter the defendant's version of events, the State offered only circumstantial evidence of the defendant's guilt. Fleming's fiancée, Robinson, testified that she was outside of her house prior to the shooting and saw Fleming and Gladney returning from the corner where they had spoken to a crowd of people about Kendra. Robinson observed the defendant walking down the street between Fleming and Gladney and did not hear either Fleming or Gladney speak to the defendant prior to the shooting. She also claimed that neither Fleming nor Gladney had a weapon

that night; however, she did not see the shooting. In addition, although no weapon was found near or beneath Gladney's body, bullets from two different types of firearms were recovered from the scene of the shooting, and Gladney's body was covered by a blanket before the police arrived. The State also offered forensic evidence establishing that Gladney was shot six times and that the two bullets recovered from his body during the autopsy came from the Glock recovered from the defendant's person upon his arrest. While the medical examiner testified that four of the victim's wounds revealed that the bullets' path was from behind and downwards, she also found no "stippling" on any of the exposed skin wounds, which would have been an indication of close-range fire. Finally, the State introduced video surveillance footage, which had no audio, was grainy, and only depicted the defendant walking down the street with Smith prior to the shooting.

¶ 92 Under this record, we find that the evidence was so closely balanced that the confluence of instructional errors regarding the State's burden of proof on justification threatened to tip the scales of justice against the defendant. In this respect, we find relevant that where the definitional instruction on attempted first degree murder correctly informed the jury regarding the element of justification, using the phrase "without lawful justification" (IPI 6.05X), the jury acquitted the defendant of attempted murder. However, where the definitional instruction on first degree murder (IPI 7.01) incorrectly omitted that same phrase, the jury convicted the defendant of murder using the same closely balanced evidence. Accordingly, we find plain error requiring reversal and remand for a new trial.

¶ 93 In coming to this conclusion, we have considered the decisions in *People v. Rios*, 318 Ill. App. 3d 354 (2000), and *People v. Soto*, 2021 IL App (2d) 180295-U, relied on by the State and find them to be inapposite. Neither case involved the confluence of the same instructional errors as are present here. In *Rios*, where the central issue at trial was whether the defendant acted in self-

defense or committed first- or second-degree murder, the jury was correctly instructed with only IPI 7.01 and IPI 7.06. *Rios*, 318 Ill. App. 3d 359-60. The single alleged error in that case was the omission of the phrase "without lawful justification" from IPI 7.01. *Id*. Similarly in *Soto*, the sole contention on appeal was that defense counsel was ineffective for simultaneously tendering amended IPI 7.02 and 7.06, which both included language stating that the State had to prove that the defendant was not justified in using the force that he did. *Soto*, 2021 IL App (2d) 180295-U, ¶¶ 54-55. In *Soto*, there was no allegation that any instruction failed to include the justification element of the offense. *Id*.

¶ 94 Moreover, unlike here, in *Rios* and *Soto*, the jury did not express any confusion regarding the applicable law. In *Rios*, there was no mention of any notes sent to the judge during deliberations. And in *Soto*, the appellate court stated that it could not infer any confusion to the jury because "it did not send a note inquiring about how to apply the [relevant] instruction" but rather only asked for transcripts. *Soto*, 2021 IL App (2d) 180925-U, ¶¶ 49, 60. Finally, unlike in the present case where the evidence regarding the reasonableness of the defendant's conduct was close, in both *Rios* and *Soto*, the courts found that the evidence overwhelming supported guilty findings. *Rios*, 318 Ill. App. 3d 361; *Soto*, 2021 IL App (2d) 180925-U, ¶ 61. Accordingly, neither *Rios* nor *Soto* applies, and the defendant has established plain error requiring remand for a new trial.

¶ 95 Before we can remand for a new trial, however, we must first determine whether the evidence is sufficient in order to circumvent any double jeopardy concerns. *People v. Lopez*, 229 Ill. 2d 322, 367 (2008).

¶ 96 The double jeopardy clause of the fifth amendment to the United States Constitution, provides that no person shall "be subject to the same offense to be twice put in jeopardy of life or

33

limb." U.S. Const. amends. V, XIV. The clause prohibits the retrial of a defendant "for the purpose of affording the prosecution another opportunity to supply evidence which it failed to present in the first proceeding." *Lopez*, 229 Ill. 2d at 367; see also *People v. Williams*, 188 Ill. 2d 293, 307 (1999) (quoting *Green v. United States*, 355 U.S. 184, 187-88 (1957)) ("The cornerstone of the double jeopardy clause is 'that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.' "). The clause, however, does not preclude retrial where a conviction has been set aside because of an error in the proceedings leading to the conviction. *People v. Drake*, 2019 IL 123734, ¶ 20; *Lopez*, 229 Ill. 2d at 367. The State cannot retry a defendant once it has been determined that the evidence introduced at trial was insufficient to sustain a conviction. *Id*. However, retrial is permitted where the evidence presented at the initial trial, including any improperly admitted evidence, was sufficient to sustain a guilty finding. *Id.*

¶ 97    It is well settled that when reviewing the sufficiency of the evidence, the reviewing court must determine whether after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Brown*, 2013 IL 114196, ¶ 48; see also *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004) (citing *People v. Smith*, 185 Ill. 2d 532, 541 (1999)). A criminal conviction will be reversed only where the evidence is so contrary to the verdict, or so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt regarding the defendant's guilt. *Brown*, 2013 IL 114196, ¶ 48. This same standard applies regardless of whether the evidence is direct or

circumstantial, and regardless of whether the defendant received a bench or a jury trial. *Brown*, 2013 IL 114196, ¶ 48.

¶ 98 A person commits first degree murder when he kills an individual "without lawful justification" and in performing the acts which caused the death he: (1) "either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another" or (2) "knows that such acts create a strong probability of death or great bodily harm to that individual or another[.]" 720 ILCS 5/9-1(a)(1), (2) (West 2018).

¶ 99 Self-defense is an affirmative defense and a "lawful justification" for first degree murder because a person is justified in the use of deadly force if he reasonably believes that the force is necessary to prevent imminent death or great bodily harm to himself or another. See 720 ICLS 5/7-1(a) (West 2018); *People v. Gray*, 2017 IL 120958, ¶ 50; *People v. Lee*, 213 Ill. 2d 218, 224 (2004); *People v. Jeffries*, 164 Ill. 2d 104, 128 (1995). Once this affirmative defense is raised by the defendant, in addition to proving the elements of the charged offense, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self- defense. *Id*.

¶ 100 The elements of self-defense include: (1) unlawful force threatened against a person; (2) the person threatened was not the aggressor; (3) the danger of harm was imminent; (4) the use of force was necessary; (5) the person threatened actually and subjectively believed a danger existed that required the use of the force applied; and (6) the beliefs of the person threatened were objectively reasonable. *Gray*, 2017 IL 120958, ¶ 50; *Lee*, 213 Ill. 2d at 224. If the State negates any one of these elements, the defendant's claim of self-defense necessarily fails, and the trier of fact must find the defendant guilty of first-degree murder. *Gray*, 2017 IL 120958, ¶ 50; *Lee*, 213 Ill. 2d at 224; *Jeffries*, 164 Ill. 2d at 128.

¶ 101   In deciding a claim of self-defense, it is the function of the jury, as the trier of fact, to assess the credibility of the witnesses, the weight to be given their testimony and the inferences to be drawn from the evidence. *Gray*, 2017 IL 120958, ¶ 50; *Lee*, 213 Ill. 2d at 224; see also *People v. Tigner*, 194 Ill. App. 3d 600, 606 (1990) ("Having had the opportunity to view the witnesses, the [trier of fact] is in a much better position to make the credibility assessment"). The jury is similarly tasked with resolving any conflicts or inconsistencies in the evidence. *Gray*, 2017 IL 120958, ¶ 50; *Lee*, 213 Ill. 2d at 224. As a reviewing court we may not substitute our judgment for that of the trier of fact on issues of weight of evidence, or the credibility of witnesses. See *Brown*, 2013 IL 114196, ¶ 48.

¶ 102   While it is true that in the instant case, the only direct evidence of what transpired between the defendant, Fleming, and Gladney, largely came from the defendant's own self-serving testimony, the jury did not have to believe the defendant's version of the facts. See *People v. Price*, 158 Ill. App. 3d 921, 926. The jury could consider other facts and circumstances in the record, which tended to contradict the defendant's story or raise serious questions about its probability. *Id.* at 926-27.

¶ 103   Viewing the evidence introduced at trial in the light most favorable to the State, we find that based on Robinson's testimony, and the forensic evidence regarding Gladney's wounds, a rational jury could have found that the defendant's actions were inconsistent with self-defense and that his use of deadly force under the circumstances was not justified. Accordingly, while the evidence regarding justification here was close, when viewed in the light most favorable to the State, it was nonetheless sufficient to sustain a conviction for first degree murder such that a retrial of the defendant would not violate double jeopardy principles. See *Ayres*, 331 Ill. App. 3d at 754 (citing *People v. Stafford*, 325 Ill. App. 3d 1069, 1075 (2001)).

¶ 104   Having decided this issue as we do, we need not address the remaining claims that the defendant makes on appeal.

¶ 105                            III. CONCLUSION

¶ 106   For the aforementioned reasons, we reverse and remand this cause for a new trial.

¶ 107   Reversed and remanded.